UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

GIL BAKER,                              :

                    Plaintiff,          :

           - against -                  :        **OPINION**

THE ROBERT I. LAPPIN CHARITABLE         :        04 Civ. 426 (DC)
FOUNDATION and ROBERT I. LAPPIN,
in his individual capacity and as       :
a trustee of THE ROBERT I. LAPPIN
CHARITABLE FOUNDATION,                  :

                    Defendants.         :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**         THE SHAPIRO FIRM, LLP
                         Attorneys for Plaintiff
                              By:  Robert J. Shapiro, Esq.
                                   Natalia Porcelli Good, Esq.
                         500 Fifth Avenue
                         New York, NY  10110

                         BINGHAM McCUTCHEN LLP
                         Attorneys for Defendants
                              By:  Kenneth I. Schacter, Esq.
                                   Philip L. Blum, Esq.
                         399 Park Avenue
                         New York, NY  10022

**CHIN, D.J.**

          In 2001, defendants Robert I. Lappin and The Robert I.

Lappin Charitable Foundation (the "Foundation") hired plaintiff

Gil Baker to write and produce an educational film entitled <u>Great

Jewish Achievers</u> ("<u>GJA</u>").  <u>GJA</u> highlighted the accomplishments of

notable Jewish figures, and when it was completed in November

2002, the Foundation distributed it free of charge to more than

2,000 educational and religious institutions throughout the

United States.

In this case, Baker contends that he agreed to produce GJA -- purportedly on financial terms favorable to defendants -- in return for Lappin's promise to fund an unrelated feature-length film, Bungalow 6, that Baker was planning to make in the future. In other words, Baker contends that the consideration for his agreement to produce GJA was Lappin's promise to invest in Bungalow 6. Lappin has not provided that funding, and Baker has sued defendants for breach of contract, contending that he is entitled to damages of at least $500,000. Baker also asserts claims for unjust enrichment, quantum meruit, and copyright infringement.

Before the Court are the parties' cross-motions for partial summary judgment. The principal issue presented is whether, even under Baker's version of the facts, the purported agreement obligating Lappin to provide funding for Bungalow 6 was sufficiently certain in its material terms as to be enforceable. Other issues include whether Baker's quasi-contractual claims are barred because an express contract governs; whether the claims against Lappin in his individual capacity fail because the Foundation, and not Lappin, hired Baker; and whether Baker's copyright infringement claim is precluded because Baker was not the sole author of GJA and the Foundation was, at a minimum, a co-author.

For the reasons that follow, both motions are granted in part and denied in part.

**STATEMENT OF THE CASE**

**A.    The Facts**

      Construed in the light most favorable to Baker, the facts are as follows:

    **1.    The Parties**

      Baker, a resident of New York, is a filmmaker whose work has been broadcast on networks throughout the world. (Compl. ¶ 6).

      The Foundation is a charitable not-for-profit organization with its principal place of business in Massachusetts.  (Lappin 6/9/05 Decl. ¶ 2).  It exists "to serve the interests of the Jewish community" and seeks to provide, among other things, support for Jewish educational programs. (Id.).  Lappin, a resident of Massachusetts, is a trustee and the sole benefactor of the Foundation.  (Id. ¶ 1; Answer ¶ 8).

    **2.    GJA**

      In or before 1999, Lappin conceived the idea of producing a film about great Jewish achievers to be distributed free to Jewish organizations to enhance Jewish pride in young people.  The film was to be produced and distributed with funding provided by the Foundation.  (Lappin 6/9/05 Decl. ¶¶ 3, 4).

      In early 2001, the Foundation began exploring options for producing GJA.  (Id. ¶ 6).  In November 2000, Lappin attempted to interest a prominent film director and producer in the project, advising that he was prepared to spend "up to one

- 3 -

million dollars" on the film.  (Good 7/8/05 Aff. Ex. D).  In April 2001, the Foundation developed a specification sheet and statement of explanation that it distributed to solicit proposals.  (Lappin 6/9/05 Decl. ¶ 7).  Defendants apparently eventually received two proposals from filmmakers; one quoted a price of more than $700,000 and the other a price of more than $1 million.  (Baker Dep. 13-14).

###    3.    **Baker Works on GJA**

Baker and Lappin had known each other for many years, as Baker was close friends with Lappin's son, Peter.  (Baker Dep. 14; P. Lappin Dep. 13).  Lappin had asked Peter to look at the two proposals.  (P. Lappin Dep. 17, 20-21).  Peter forwarded them to Baker to get his "objective professional opinion" on "whether these were legitimate proposals or whether they were blown-up figures, exorbitant prices."  (Baker Dep. 14; see P. Lappin Dep. 17-21).

Baker reviewed the proposals and eventually he and Lappin spoke about the project.  (Baker 7/8/05 Aff. ¶ 4).  Baker told Lappin that the two proposals were asking for "a lot of money."  (Baker Dep. 18).  Baker then provided some initial assistance, making some creative suggestions by drafting ten sample pages of a script and creating a name montage for the film, for which he received $2,500.  (Baker 7/8/05 Aff. ¶ 4).

On April 30, 2001, Lappin sent Baker an e-mail, on behalf of the Foundation, inviting him to respond to the Foundation's solicitation for proposals for a script for GJA.

The e-mail included a description of and specifications for the proposed documentary.  The format was to be four fifteen-minute segments.  (Schacter 7/11/05 Decl. Ex. E).  Although the e-mail was from Lappin, it was clearly on behalf of the Foundation and the project clearly was intended to be a Foundation project. (Id.).

Baker responded by e-mail on May 7, 2001.  He stated that although he was busy working on another film,

> I may have the time to write at least [] one
> or two of the segments you need.  My fee for
> research, writing and a re-write, wouldn't
> exceed $2,500 per fifteen minute script.  A
> writer who wanted much more than that, might
> be asking too much.

(Id. Ex. F).

Baker began working on GJA in the spring of 2001. (Baker 6/9/05 Aff. ¶ 6).  On June 22, 2001, Baker sent Lappin an e-mail with a proposed budget for making GJA.  The budget was for $70,000, covering four scripts, hosts and studio, interviews, archival footage, and $15,000 for "[c]ontingency."  (Schachter 6/9/05 Decl. Ex. D).  The proposal noted that "[t]he actual budget could be CONSIDERABLY LESS."  (Id.).

Over the course of the next twelve months, as he worked on the project, Baker sent Lappin numerous revised budgets, ranging from $120,000 to a high of $155,500.  (Id. Exs. E-J). The increase was due, at least in part, to an increase in the number of segments from four to five.  (Baker 7/8/05 Aff. ¶ 7). The budgets included amounts for items such as research, scripting, archival research, editing, and contingency.  (See,

e.g., Schacter 6/9/05 Decl. Exs. E, G, I).  The earlier budgets
noted a "-" or "N/C" -- meaning no charge -- for items such as
"Directorial Fees" and "Production Design."  (Id. Exs. E, F, G).
Near the conclusion of the project, Baker sent the Foundation an
"accounting of production expenses," covering the period from
September 2001 through June 2002.  It showed "total production
expenses" of $155,500, payment of the same amount, and a balance
of zero.  (Id. Ex. K).  It included items such as research and
scripting ($30,500), editorial and production services ($40,500),
and film archive and photo research ($25,000).  (Id.).

        Although Baker now contends that he "waived all of his
creative fees" and was paid only for out-of-pocket expenses (Pl.
Opp. Mem. at 5), the documentary evidence shows otherwise.  In a
fax dated April 15, 2002, Baker acknowledged having been paid for
at least some of his "time," as he wrote:  "I've seen less than
$9,000 for my time to date . . . ."  (Schacter 6/9/05 Decl. Ex.
O).  Moreover, he undoubtedly received some portion of the
$30,500 paid for "research and scripting."  (Id. Ex. K).  In
addition, Baker's check register shows that he used monies
received from the Foundation for GJA to pay for personal bills,
including: his mortgage ($4,876), his co-op maintenance fees
($7,251), home telephone and internet service ($3,396) and home
utilities ($800).  (Lappin 6/9/05 Decl. ¶¶ 23-24 & Ex. A;
Schacter 6/9/05 Decl. Ex. M).[1]

_____

        [1]    Baker concedes that these mortgage and maintenance
payments were for his Manhattan apartment, but contends that he
was living in Queens and kept the Manhattan apartment "in part

**4.    The Completion of GJA**

GJA was completed in November 2002, and it was
distributed free of charge, at the Foundation's expense, to some
2,000 Jewish religious and educational organizations. (Lappin
6/9/05 Decl. ¶¶ 4, 5). Baker assisted in the distribution effort
by making arrangements with third-party vendors for duplication
bulk mailing of the film. (Baker Dep. 274; Lappin 7/8/05 Decl.
¶¶ 9-11). Unfortunately, after GJA was distributed, the
Foundation learned that two of the individuals included in GJA
were not Jewish and were included by mistake. (Baker 6/9/05 Aff.
¶¶ 18-21).

Baker's name does not appear in the credits or anywhere
else in the DVD of GJA provided to the Court. (CX 1).[2] He is
not identified as a writer or a director or at all. (Id. at
55:33-56:08; Baker Dep. 225). The closing credits start by
stating that the film was "[m]ade possible by the Robert I.
Lappin Charitable Foundation." (CX 1 at 55:33). They list

---

because I needed office space to complete [GJA]." (Baker 7/8/05
Aff. ¶ 30). Similarly, he contends that his "cell phone, long
distance and Internet bills" were properly GJA expenses because
he had to communicate with his staff and with the Foundation in
Boston regarding GJA's progress and he did "extensive research"
for GJA through his "internet connection." (Id. ¶ 31). A
reasonable jury could only be troubled by these assertions.
Baker does not and cannot contend that the Manhattan apartment
and his cell phone, land phone, and Internet service were used
solely for GJA, and it is difficult to understand how he could
justify charging the entirety of these expenses to GJA.
Moreover, the commingling of GJA expenses with personal expenses
and of GJA funds with funds received from other sources, as shown
by the check register, is questionable.

  [2]    The DVD has been marked Court Exhibit ("CX") 1.

Lappin as the Executive Producer and Coltin as the Associate Producer. (Id. at 55:40, 55:47). The credits end with the legend: "This tape may not be broadcast without written consent from the Robert I. Lappin Charitable Foundation." (Id. at 56:05). No copyright notice is provided on the DVD, either on the label or in the film. (CX 1). Nor does Baker's name appear in the teaching guide that accompanies GJA. (Baker Dep. 228). In the end, Baker did not want his name associated with GJA and he was "happy to let Bob take credit for it." (Id.). When GJA was distributed, a cover letter on Foundation letterhead identified the Foundation as the film's source. (Lappin 7/8/05 Decl. ¶ 10).

At the Foundation's request, Baker also created a website, gjainfo.com, as a supplement to GJA. The website became operational as of November 1, 2002 and continues to operate today. (Baker 6/9/05 Aff. ¶ 10). Baker also created, at the Foundation's request, a five-minute promotional video and a three-dimensional "Nobel Montage" to be used in conjunction with GJA. (Id. ¶ 9; Baker 7/8/05 Aff. ¶ 10). Baker also helped with a teaching guide that was to accompany the film, which Lappin and Coltin wrote. (Baker 7/8/05 Aff. ¶ 10; see also Lappin 6/9/05 Decl. ¶ 21).

### 5. **Lappin's Purported Agreement To Fund Bungalow 6**

Baker contends that Lappin agreed, in return for Baker's work on GJA, to fund Bungalow 6. Although Baker and Lappin exchanged e-mails and other documents, Baker acknowledges

- 8 -

that no documents make any reference to <u>Bungalow 6</u> or any
agreement by Lappin to provide Baker with funding for <u>Bungalow 6</u>.
(Baker Dep. 48; <u>see</u> Lappin 6/9/05 Decl. ¶ 13).  Baker "never
once" put in writing, in an e-mail or otherwise, anything about
the alleged agreement with Lappin.  (Baker Dep. 48-49).  Indeed,
Baker conceded at his deposition that "there is no writing and
[there] has never been any writing which embodies the essential
terms" of Lappin's purported agreement to finance <u>Bungalow 6</u>.
(<u>Id.</u> 49).

Baker contends that Lappin made a binding agreement to
invest at least $500,000 in <u>Bungalow 6</u> based on a conversation
the two had on September 9, 2001.  (Baker 7/8/05 Aff. ¶ 5; Baker
Dep. 12).  At his deposition Baker described the conversation as
follows:

> . . . [T]his was his dream, [Lappin]
> said, for over 20 years, to make a
> documentary about great Jewish achievers.
>
> So I said to him, Bob, I'll make your
> dream come true if you'll make my dream come
> true.
>
> He said, What's your dream?
>
> And I said, A little independent feature
> called Bungalow 6.
>
> He said, What's that going to cost to
> make?
>
> And I said, Approximately $500,000.  And
> I may have just said $500,000.
>
> And Bob nodded.  He said, Who wrote the
> script?
>
> I said, I did.  I said, You want to see
> it?

He said, I wouldn't know a good script from a bad script.  That was Bob talking.

And I said, You're welcome to a copy of the script.  I can send it to you.

And he said, I don't really think I need to see it.

. . .

And he nodded his head and he was thinking this over.  And he said, If you can bring in -- his response to me was, If you can bring in [GJA] to my satisfaction for the $150,000 in out-of-pocket expenses, you can make your movie.

And I -- that knocked a little breath out of my lungs.  I said, Wow.  I knew that Bob could back up -- or I believed that Bob could back up what he was saying.

And so because of that, I said -- and what was the next thing that he said?  He said that.  And I might have said, Are you sure you don't want to see the script?  Or something like that, because now this is moving ahead.

And he said, No.  And that was -- that was pretty much it.

. . .

And the last thing that was -- that I said to Bob was -- because -- so it might have been something like, So we have a deal?  Or, We have an arrangement?

And he might have said, So we have an arrangement?  Or, We have an agreement?

And I said, We do.  And I remember that we shook hands.  We stood up. . . .

And I said, so -- when he said, You'll be able to make your movie, I said, Have I got your word on that, Bob?

And he said, You do.

(Id. 24-25, 28-29).[3]

Baker acknowledges that he and Lapin never discussed, and thus never agreed on, the following terms:

- Whether the investment was to be in the form of equity, a loan, or something else (id. 32);

- Whether the $500,000 would be provided by Lappin in a lump sum or over time or when it would be paid, e.g., at the beginning or the end of the project or throughout (id. 54);

- The terms under which Lappin would be repaid (id. 42);

- Whether and how Lappin would share in any profits from Bungalow 6 (id. 45);

- Whether any share of profits would be of net profits or gross profits (id. 46);

- Who would be in control of Bungalow 6 (id. 42-43);

- Who would own the copyrights to Bungalow 6 (id. 45); and

- Whether Lappin would have approval rights over casting, content, dailies, and the like (id. 46).

_____

[3] Lappin denies that he or the Foundation ever agreed to finance Bungalow 6 and denies that the subject was ever discussed until the dispute that led to this lawsuit arose. (Lappin 6/9/05 Decl. ¶ 14). Baker testified to other conversations he purportedly had with Lappin, after the initial conversation on September 9, 2001, about funding for Bungalow 6. (See, e.g., Baker Dep. 39-41). For purposes of these motions, I assume the conversations occurred as Baker describes them.

In describing a conversation he had with Deborah
Coltin, the Executive Director of the Foundation, during which
she asked him about his plans after he completed GJA, Baker
testified:  "And I said, Well, I think Bob and I are going to be
possibly making an actual -- an actual movie together . . . ."
(Baker Dep. 50-51) (emphasis added).

### 6.    **The Foundation's Involvement in the Production of GJA**

A reasonable jury could only find that Lappin and
Coltin provided substantial creative input into GJA.  The "idea"
and the "concept" of GJA was Lappin's -- "it was Bob's
brainchild," as Baker acknowledged at his deposition.  (Baker
Dep. 195).  Baker agrees that Lappin and Coltin "made a lot of
changes" to the script.  (Id. 199).  They suggested individuals
to include in the film and they made suggestions such as
shortening or lengthening segments or eliminating music.  They
also commented on the script along the way.  (Id. 201-02).  Baker
incorporated their suggestions.  (Id. 202).  Lappin and Coltin
both played a role in writing parts of the script, including the
parts dealing with "Israel and Jewish survival and the Torah."
(Lappin Dep. 127; see also Coltin Dep. 63, 95-99, 102-04).  As
alleged in the complaint, Lappin and Coltin requested thirty-four
text revisions to video-taped dialogue and recorded narration,
which required "considerable alterations to the documentary."
(Compl. ¶ 24).

The documentary evidence shows that Lappin and Coltin
provided extensive creative input.  (See, e.g., Schacter 7/11/05

Decl. Exs. D (Baker e-mail responding to specific suggestions and comments by Lappin and Coltin), H (dozens of e-mails, letters, and notes showing extensive input from Lappin and Coltin), I (e-mail from Lappin making suggestions), J (long e-mail from Lappin with numerous suggestions and comments), L (Baker tells Lappin in e-mail: "[Y]ou would have made a phenomenal studio boss . . . or producer. The points you made were on mark."), N (several long e-mails from Lappin to Baker with numerous detailed suggestions and comments); Schacter 6/9/05 Decl. Ex. Q (long letter from Baker responding to specific comments and questions of Lappin). For example, in an e-mail sent by Lappin to Baker on August 31, 2001, Lappin provided feedback on a draft of the script:

> Generally, I feel you are on the right track,
> but I have a strong feeling that the tone is
> not sufficiently sophisticated for ten to
> fourteen year olds. . . . Perhaps we are
> doing what we said we should not do --
> talking down to the youngsters.

(Id. Ex. H at 01056). Baker's response, dated September 1, 2001, shows his reaction to Lappin's suggestions:

> as usual, your perceptions are on target
> . . . the youngest is too young . . . it
> won't take long to smarten up this first
> draft . . . as we had discussed, each show
> can end with a teaser on the next.

(Id. Ex. H at 01077).

Another long e-mail from Lappin to Baker shows that Lappin and Coltin contributed not just general ideas but specific suggestions for the expression of ideas:

Gil,

Debbie and I have gone over the script carefully, and here are out thoughts:

1)    Rather than starting with an intellectual discussion, that falls short of being exciting, consider opening with actual film clips of some of our great Jewish achievers.  Possibly include Mark Twain. Then have someone ask the group if they know what all these people have in common. Answer:  all Jewish, except one.  Then go from there with Mark Twain as on pages 11 & 12 of the script.

. . .

3)    When you get in the script to the smallness of our numbers, you might help make the point visually by illustrating that there are approximately 1000 people in the world to every two Jews. . . .

4)    Similarly on Israel, show a world map, highlighting tiny Israel with bright color, so its tinyness stands out.

5)    Assuming you like 1) above, pages 1 & 2 as written would be out. . . . [O]n page 3, The Girl -- "he's cuter than all . . . together."  We feel this stereotypes and trivializes girls.  The boys talk numbers and facts.  All girls care about is how cute boys are.

. . .

13)    We suggest opening the second Episode with Adam Sandler's Hanukah Song.  You could then pick out the great Jewish achievers, he mentions.

14)    Generally, and I repeat your own mantra, that we must avoid talking down.  We fear much of the script falls into this trap, and will be considered "lame" by youngsters.

(Id. Ex. H at 01098-99).

- 14 -

Baker testified at his deposition in this respect as follows:

> Q.   So would it be fair to say that this film is the product of your work and Bob and Debbie's work together?
>
> A.   Well, you could say it that way. And the person could walk away thinking Gil did half and Bob and Debbie did half or Gil did a third, Bob did a third, and Debbie did a third.  That would be I think a misrepresentation.
>
> Q.   I'm not asking for quantities now. . . . But without getting into quantities, would it be fair to say that the work, this film, was the product of joint work by yourself and Bob and Debbie together in some quantity?
>
> A.   Yeah, that you could say.

(Baker Dep. 202-03).

Although Baker and Lappin never discussed ownership of the copyright to <u>GJA</u>, he understood that the "owner of the rights to the film" was "probably Bob" or "Bob's foundation."  (<u>Id.</u> 230).

### 7.   **The Thanksgiving Day Dispute**

On Thanksgiving Day 2002, at a family gathering at Peter Lappin's home in Massachusetts, Baker and Lappin had a discussion about <u>Bungalow 6</u>.  The two differ in their descriptions of the conversation, but they agree that Lappin declined to provide any funding for <u>Bungalow 6</u>.  (Baker 7/8/05 Aff. ¶ 23; Lappin 6/9/05 Decl. ¶¶ 17-18).[4]  The two also agree

---

[4]   Baker contends that Lappin "reneged" on his prior agreement to finance <u>Bungalow 6</u>, while Lappin contends that Baker

that Lappin suggested that the Foundation was prepared to make additional payments to Baker, although Baker describes this as an offer by Lappin to pay "'bills' for the work I had done and any additional expenses related to GJA" (Baker 7/8/05 Aff. ¶ 24), while Lappin states that he agreed only that the Foundation would "compensate [Baker] fairly" for "any extra work on non-film matters" performed at the Foundation's request (Lappin 6/9/05 Decl. 19).

Baker sent Lappin seven bills in late December 2002, totaling more than $80,000. (Schacter 6/9/05 Decl. Ex. B). They covered services such as compiling, verifying, and editing the Foundation's mailing list and preparing a "duplication master" of GJA, as well as services in connection with a GJA trailer, documentary guide, and website. (Id.). After receiving these bills the Foundation paid Baker only an additional $22,000. (Baker 7/8/05 Aff. ¶¶ 26-27; see Schacter 6/9/05 Decl. Ex. C (Lappin letter to Baker complaining of "shockingly and shamelessly inflated" bills)). Although the invoices were sent to Lappin, they were all addressed to the Foundation and not to Lappin personally. (Schacter 6/9/05 Decl. Ex. B). By the end, with the additional payments, the Foundation had paid Baker a total of some $177,500. (Baker 7/8/05 Aff. ¶ 26; Lappin 6/9/05 Decl. ¶ 16).

---

made an "overture" for funding for Bungalow 6, to which Lappin purportedly responded that neither he nor the Foundation had any interest in funding a commercial movie. (Baker 7/8/05 Aff. ¶ 23; Lappin 6/9/05 Decl. ¶¶ 17-18).

## B.   **Prior Proceedings**

This suit was commenced on January 20, 2004.  The Court has subject matter jurisdiction over the action because of the diversity of citizenship of the parties and the existence of a claim under the Copyright Act of 1976.  (Compl. ¶ 9 (citing 28 U.S.C. §§ 1332 and 1338)).

The complaint asserts eight causes of action: (1) breach of contract for Lappin's failure to honor his purported contractual obligation to fund Bungalow 6 (Compl. ¶¶ 34-35); (2) unjust enrichment as defendants purportedly received Baker's services in creating and producing GJA "without fully paying for the same" (id. ¶¶ 37-38); (3) in the alternative, quantum meruit for the reasonable value of Baker's time and services making GJA (id. ¶ 41); (4) breach of contract for Lappin's failure to honor his obligations under a purported marketing and distribution agreement (id. ¶¶ 43-44); (5) unjust enrichment as defendants purportedly received benefits from Baker's work with respect to the website, teaching guide, marketing materials, etc., for which they have not paid Baker (id. ¶¶ 46-48); (6) in the alternative, quantum meruit for the reasonable value of Baker's work with respect to the latter (id. ¶ 50); (7) copyright infringement (for which declaratory relief is sought) (id. ¶ 52); and (8) conversion as defendants purportedly converted the GJA materials and teaching guides that are the property of Baker (id. ¶ 54).

Defendants filed an answer denying the principal allegations of the complaint and asserting counterclaims for (1)

breach of warranty because two non-Jewish individuals were mistakenly included in <u>GJA</u> (Answer Countercls. ¶¶ 41-45); (2) declaratory relief with respect to the ownership to the copyrights (<u>id.</u> ¶¶ 47-54); and (3) replevin for the return of the "master" copy of <u>GJA</u> (<u>id.</u> ¶¶ 56-60).

The parties engaged in discovery and these motions followed. Defendants seek partial summary judgment on the grounds that: (1) the breach of contract claim for funding for <u>Bungalow 6</u> fails as a matter of law because the agreement is not sufficiently definite and certain to be enforceable; (2) the breach of contract claim for funding for <u>Bungalow 6</u> is barred by the statute of frauds; (3) the quasi-contractual claims relating to the production of <u>GJA</u> fail because the parties' rights are governed by an express contract; (4) the claims against Lappin for compensation for additional work fail because any agreement concerning any such additional work was with the Foundation and not Lappin individually; and (5) the copyright claim fails as a matter of law because <u>GJA</u> was a "joint work" of Baker and the Foundation. Baker moves for partial summary judgment in his favor on his copyright claim and dismissing defendants' counterclaims.

## <u>DISCUSSION</u>

I address defendants' motion first and Baker's motion second.

## A. **Defendant's Motion**

I address each prong of defendants' summary judgment motion, with the exception that I do not reach the statute of frauds issue.

### 1. **Indefiniteness**

The first issue presented by defendants' motion is whether Lappin's purported agreement to provide funding for Bungalow 6 is barred by the doctrine of indefiniteness.

#### a. **Applicable Law**

Under New York law,[5] contracts are unenforceable unless the parties reach a meeting of the minds on all material terms. See Shann v. Dunk, 84 F.3d 73, 78 (2d Cir. 1996) (under New York law, "contracts are unenforceable unless they cover all essential terms"). As the New York State Court of Appeals has held:

> Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract.

Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 482 (1989).

Courts are "loath to refuse enforcement of agreements on indefiniteness grounds," Best Brands Beverage v. Falstaff Brewing Corp., 842 F.2d 578, 588 (2d Cir. 1987) (citation

---

[5] Both sides apply New York law. (See Def. Supp. Mem. at 9-10; Pl. Opp. Mem. at 10). Moreover, here there clearly is a significant connection to New York, as Baker performed much if not most of his work on GJA in New York. (See Baker 7/8/05 Aff. ¶ 30).

omitted), but they will do so "'if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain.,'" id. (quoting Candid Prods., Inc. v. Int'l Skating Union, 530 F. Supp. 1330, 1333-34 (S.D.N.Y. 1982)).  Where essential terms are missing, a court may not rewrite a contract for the parties to impose obligations not bargained for, but the court must consider whether the missing terms can be supplied in a reasonable fashion consistent with the intent of the parties. B. Lewis Prods., Inc. v. Angelou, No. 01 Civ. 0530 (MBM), 2005 U.S. Dist. LEXIS 9032, at *14-15 (S.D.N.Y. May 12, 2005).  Terms that may be essential include, for example: "the price to be paid, the work to be done, and the time of performance."  Id. at *17.

> b.  **Application**

On the record before the Court, even accepting as true Baker's version of his conversations with Lappin, no reasonable jury could find that the parties reached a meeting of the minds on the essential elements of a financing agreement for Bungalow 6.  As Baker conceded at his deposition, there was no discussion, much less any agreement, on critical items such as the nature of the investment (whether loan or equity or otherwise); the time of performance (when Lappin was to provide the $500,000); the manner of performance (whether the funds would be paid in a lump sum or installments); the terms of repayment (if the monies were to be

repaid at all); whether interest would be paid and if so at what rate; whether Lappin would share in profits and if so in what manner and to what extent; whether and to what extent Lappin would have any control over content, casting, or other creative issues; and who would own the copyrights.

These are matters that "seriously affect[] the rights and obligations of the parties." Ginsberg Mach. Co. v. J&H Label Processing Corp., 341 F.2d 825, 828 (2d Cir. 1965). The absence of any agreement or discussion of these critical matters is fatal to Baker's assertion that the parties intended to be bound, and makes it impossible for any court or jury to fashion "a proper remedy." Cobble Hill Nursing Home, 74 N.Y.2d at 482. Nor are there any reasonable means for filling in the missing terms; the intent of the parties simply cannot be ascertained. Hence, because of its indefiniteness, the purported agreement is unenforceable.

In this respect, Baker relies heavily on the testimony of Stephen Mortell, who testified that Baker told him that Lappin had agreed to finance Bungalow 6. (Mortell Dep. 62). This reliance is misplaced. First, what Baker told Mortell is clearly hearsay; Mortell was simply repeating what he heard from Baker. To the extent Baker was describing to Mortell what Lappin purportedly said to Baker, the description is still hearsay. Second, even if it is admissible, Mortell's testimony does not help Baker, for the purported agreement is still fatally indefinite.

Accordingly, defendants' motion for summary judgment is granted to the extent that Baker's claim that Lappin is contractually bound to finance <u>Bungalow 6</u> is dismissed.[6]

## 2. <u>The Contract as a Bar</u>

Defendants argue that Baker's quasi-contractual claims for additional compensation for work on <u>GJA</u> are barred because an express contract exists between the parties, citing cases that hold that where a valid, express agreement governs the relationship between the parties, no implied contractual claims are viable. (Def. Supp. Mem. at 11-12 (citing, <u>e.g.</u>, <u>Data-Stream AS/RS Techs., LLC v. China Int'l Marine Containers, Ltd.</u>, No. 02 Civ. 6530 (JFK), 2004 U.S. Dist. LEXIS 6594, at *20-21 (S.D.N.Y. Apr. 13, 2004), and <u>Leber Assocs., LLC v. Entm't Group Fund, Inc.</u>, No. 00 Civ. 3759 (LTS), 2003 U.S. Dist. LEXIS 13009, at *62 (S.D.N.Y. July 29, 2003)).

The argument is rejected. While I have no quarrel with the legal proposition, it does not apply here. First, I have held that there was no enforceable agreement by Lappin to provide funding for <u>Bungalow 6</u>. Hence, there is no valid, express agreement in this respect. Second, although there is a valid agreement between the parties to the extent that Baker agreed to provide services to the Foundation and the Foundation agreed to accept and pay for those services, it is not clear what the

---

[6]     In light of my ruling on the issue of the indefiniteness of the purported agreement, I do not reach defendants' statute of frauds argument.

agreement was.  Factual issues exist as to the terms of the
parties' agreement -- if they agreed at all -- on the
compensation to be paid to Baker for his creative services.

Baker contends that he essentially agreed to work on an
expenses-only basis in return for Lappin's promise to fund
Bungalow 6.  There is some evidence in the record to support that
contention.  Although I conclude that Lappin's promise (even
assuming it was made) was unenforceable, a reasonable factfinder
could conclude that Baker was entitled to be paid something to
reasonably compensate him for his creative services.  In other
words, a reasonable jury could conclude that under all the
circumstances, in the absence of a clear, express, enforceable
agreement as to his compensation, Baker is entitled to be paid on
a quantum meruit basis.

Defendants argue that Baker was paid for his creative
services, and it is true that the record contains evidence to
show, for example, that Baker was paid something "less than
$9,000" for his time as of April 15, 2002, and that Foundation
funds were applied to seemingly personal expenses such as the
mortgage and co-op maintenance fees on Baker's Manhattan
apartment.  Genuine issues of fact exist, however, as to what he
was paid and whether he received fair value for his services.
Even though Baker is not entitled to be paid damages for the
failure of Lappin to provide funding for Bungalow 6, he arguably
would be entitled to additional compensation from the Foundation
for the fair value of his services if indeed he waived his fees

with the expectation that he would receive that funding.  At
trial, defendants are free to argue that Lappin never made a
promise, enforceable or otherwise, to provide funding for
Bungalow 6; even assuming such a promise was made, it was wholly
unconnected to GJA; Baker was paid all that he was entitled to be
paid; and he was paid the reasonable value of his services in any
event.  These are issues for the jury to decide.

Accordingly, this prong of defendants' summary judgment
motion is denied.

### 3. __The Claims Against Lappin__

Defendants next argue that Baker's claims for
compensation for the additional work he did with respect to
marketing and distribution, the teaching guide for GJA, and the
website must be dismissed as to Lappin individually, for Baker
was hired by and the work was done for the Foundation.  I agree.

On the record before the Court, a reasonable jury could
only find that Baker was hired to provide services to the
Foundation and that Lappin was acting merely as a representative
of the Foundation.  Baker was in privity not with Lappin but with
the Foundation.

The initial April 30, 2001, e-mail soliciting Baker's
involvement was sent on behalf of the Foundation, and it clearly
contemplated that the work was to be done for the Foundation and
not for Lappin individually.  (Schacter 7/11/05 Decl. Ex. E).
The seven bills sent by Baker in December 2002 for the additional
work were all addressed to the Foundation.  (Schacter 6/9/05

Decl. Ex. B).  Baker was seeking payment from the Foundation.
From the outset, the concept was that this was a documentary to
be funded and distributed by the Foundation to further its goals
and mission.  The additional work for which Baker seeks
compensation was performed for the Foundation to assist it in its
efforts to market and distribute <u>GJA</u>.

  Although Lappin negotiated the arrangement with Baker,
a reasonable jury could only find that he was acting not in his
individual capacity but in his representative capacity on behalf
of the Foundation.

  Baker argues that Lappin was the trustee and sole
benefactor of the Foundation and that the Foundation bears
Lappin's name.  (Pl. Opp. Mem. at 19-20).  While these assertions
are correct, they do not change the indisputable fact that Baker
was engaged by the Foundation to provide services on behalf of
the Foundation.  Baker's conclusory assertion that the work was
performed for Lappin as an individual and not for the Foundation
is simply belied by the documentary invoices, including seven
invoices prepared by Baker himself seeking payment not from
Lappin but from the Foundation.

  Moreover, to the extent Baker seems to be proceeding on
an "alter ego" theory, the claim is rejected.  First, the
complaint does not assert an "alter ego" or "veil-piercing"
claim.  Hence, no such claim is in the case.  Second, the
complaint alleges only that the Foundation is a charitable
organization with its principal place of business in

Massachusetts.  It does not specify whether the Foundation is a not-for-profit corporation or a partnership or a trust or some other entity.  The Court is unable to consider whether there is a basis for disregarding the form or shell of the entity to reach the assets of the principal, without knowing what the form of the entity is.  This prong of defendants' motion is granted.

### 4.  **The Copyright Claim**

Finally, defendants argue that Baker's copyright infringement claim must be dismissed because the indisputable facts show, as a matter of law, that Lappin and Coltin, working on behalf of the Foundation, were joint authors of <u>GJA</u> and that <u>GJA</u> was a joint work.[7]

---

[7]    Although defendants commissioned Baker to make <u>GJA</u>, defendants have not relied on the theory that they own the copyright to the film because it is a "work made for hire."  <u>See</u> 17 U.S.C. § 201(b) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.").  A "work specially ordered or commissioned" qualifies as a "work made for hire" only if "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."  17 U.S.C. § 101.  Here, no such instrument exists, and hence defendants rely instead on the theory that <u>GJA</u> is a joint work.  If a work is prepared by an independent contractor on commission, no written instrument exists between the parties, and "the commissioning party also materially contributed as an author to the creation of the work, he may be held to be a joint author together with the independent contractor."  1 Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u> § 5.03[B][2][b], at 55 (2005) ("Nimmer on Copyright").

### a.　**Applicable Law**

Under the Copyright Act, a joint work is one "prepared
by two or more authors with the intention that their
contributions be merged into inseparable or interdependent parts
of a unitary whole."  17 U.S.C. § 101.  Co-authors of a joint
work are each entitled to distribute a joint work, for "[i]n a
joint work each author automatically acquires an undivided
ownership in the entire work."  Weissmann v. Freeman, 868 F.2d
1313, 1318 (2d Cir. 1989) (citation and quotation marks omitted);
see 17 U.S.C. § 201(a) ("The authors of a joint work are co-
owners of copyright in the work.").  Each joint author has the
right to license or otherwise use the work as he or she wishes,
subject only to an obligation to account to the other joint
authors for any profits.  Thomson v. Larson, 147 F.3d 195, 199
(2d Cir. 1998).

To prove co-authorship status, a co-authorship claimant
must show that each putative co-author to the work (1) made
independently copyrightable contributions and (2) fully intended
to be a co-author.  Thomson, 147 F.3d at 200; see Robinson v.
Buy-Rite Costume Jewelry, Inc., No. 03 Civ. 3619 (DC), 2004 U.S.
Dist. LEXIS 16675, **7-8 (S.D.N.Y. Aug. 23, 2004).  But see
Nimmer on Copyright § 6.07[A][3][a], at 22 (suggesting that each
author's contribution need not be copyrightable).  The key is the
intent of the parties at the time the work is done.  Thomson, 147
F.3d at 199.  There is no requirement that "the several authors
must necessarily work in physical propinquity, or in concert, nor

that the respective contributions made by each joint author must be equal either in quantity or quality."  Nimmer on Copyright § 6.03, at 7.  Each author's contribution, however, must be more than de minimis.  Id. § 6.07[A][1], at 21.  The contribution must be one of authorship, and merely contributing financing does not suffice.  Id. § 6.07[A][2], at 21.

### b.  **Application**

Here, a reasonable jury could only find that Lappin and Coltin (working on behalf of the Foundation) were joint authors of GJA.  I reach this conclusion for the following reasons.

First, Lappin and Coltin made independently copyrightable contributions to GJA.  Their input clearly was more than de minimis and involved at least a "minimal degree of creativity."  See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991).  As Baker conceded, GJA was Lappin's "brainchild."  Both Lappin and Coltin made specific suggestions with respect to the script and to individuals to include or omit.  They both played a role in writing the script and asked for dozens of changes.  The script and film were revised to reflect those requests.  The documents, and the e-mail exchanges in particular, show that Lappin and Coltin provided extensive comments and feedback and made many specific suggestions, including on how to express certain ideas.  Moreover, Lappin and Coltin made the final decisions.  (See Baker Dep. 172 ("Bob could have pulled the plug on this project any time he wanted to if his confidence in me was not what he thought it should be.")).

Although Baker apparently did the vast majority of the work, equality in quantity of contribution is not required, and a reasonable jury could only find that Lappin and Coltin were "true collaborators in the creative process." Childress v. Taylor, 945 F.2d 500, 504 (2d Cir. 1991). Similarly, even assuming Lappin and Coltin were not present in the editing room when the film was edited, as Baker alleges, the law does not require that joint authors work together or in the same place or contribute to every aspect of a project. See Gillespie v. AST Sportswear, Inc., No. 97 Civ. 1911 (PKL), 2001 U.S. Dist. LEXIS 1997, at *19 (S.D.N.Y. Feb. 22, 2001) ("[A] person need not hold the camera or push a button to be considered the author of a visual work, since one can exercise control over the content of a work without holding the camera.").

Second, a reasonable jury could only find that Lappin and Coltin intended to be joint authors. They clearly intended to merge their respective contributions into a unitary whole with the product that Baker was creating, and Baker even acknowledged at his deposition that GJA was the product of joint work by him, Lappin, and Coltin. (Baker Dep. 203). Baker chose not to take any credit for any of his work on GJA, even though he created the closing credits himself. (Id. 225-28). On the other hand, the credits list Lappin and Coltin as the Executive Produce and Associate Producer, and the Foundation is mentioned both as the source of the funding and also as the entity to contact for consent to broadcast. (CX 1 at 55:33-56:05).

Third, although defendants cannot take advantage of the work for hire provisions of the Copyright Act because of the absence of a signed instrument, the overall circumstances are still relevant to ascertaining the parties' intent. If not in the strict sense of the Copyright Act, this project still was a work for hire in a practical sense. The Foundation hired Baker to make the film, and both the Foundation and Baker fully expected that the Foundation would take control of the film to distribute it free of charge to Jewish educational and religious organizations. In the end, the Foundation paid some $177,500 to make the film. It did not do so with the expectation that Baker would retain the sole rights to the film, and Baker surely had no such expectation himself. Indeed, to the contrary, Baker testified at his deposition that he believed that Lappin or the Foundation owned "the rights to the film." (Baker Dep. 230).

Accordingly, summary judgment will be granted in favor of defendants dismissing Baker's copyright infringement claim. Baker's eighth claim for relief, alleging conversion, is also dismissed as it is dependent on the copyright claim.[8]

## B. **Baker's Motion**

Baker's motion for partial summary judgment seeks judgment granting him relief on his copyright claim and

---

[8] For the most part, the parties have not discussed the website, teaching guide, and other materials separately from GJA itself. My ruling as to the claim for copyright ownership to GJA applies to the website and other materials as well, as they were part of the same overall project and were to be used hand in hand with GJA.

dismissing all defendants' counterclaims.  The first part of the
motion is denied, for the reasons I discussed above in granting
defendants' motion for summary judgment dismissing Baker's
copyright claim.

The second part of the motion seeks dismissal of
defendants' five counterclaims.  First, I discuss the three
copyright counterclaims and the dependent counterclaim for
replevin, which seeks return of the "master" of GJA.  Second, I
discuss the counterclaim for breach of warranty.

## 1.    **The Copyright and Replevin Counterclaims**

Defendants have asserted three copyright counterclaims
(the second, third, and fourth counterclaims).  The second
counterclaim seeks a declaratory judgment that the Foundation is
"the sole owner to and author" of GJA and related works.  The
third counterclaim seeks a declaratory judgment that the
Foundation and Baker are "joint owners" of GJA and the related
works.  The fourth counterclaim seeks a declaratory judgment that
the Foundation had and still has an implied license to copy and
distribute GJA and the related works.  The fifth counterclaim is
for replevin -- return of the "master" of GJA based on the theory
that the Foundation is entitled to the master.

Baker's motion is denied as to the second counterclaim.
Although Baker clearly made independently copyrightable
contributions to GJA and the works, it is not clear that he
intended to retain an interest in the copyrights.  Certain of his

actions -- he did not want his name associated with GJA -- belie
any intent to be a co-author for copyright purposes.

Baker's motion is denied as to the third counterclaim.
At a minimum, the Foundation is a joint author of GJA and the
related materials.

Baker's motion is granted as to the fourth
counterclaim, as the issue of an implied license is now moot.

Baker's motion is denied as to the fifth counterclaim
for replevin, as his argument that he is entitled to possession
of the master of GJA is premised on the incorrect assertion that
he is the sole author of the film.  (Pl. Supp. Mem. at 20 n.15).

## 2. **The Breach of Warranty Counterclaim**

In their first counterclaim, defendants allege that
they had a binding agreement with Baker, the agreement contained
an express warranty that GJA would be completed to the
Foundation's "complete satisfaction," Baker breached that
warranty by including two non-Jewish persons in the film, and
defendants therefore are entitled to damages.  (Answer ¶¶ 41-45).
Baker moves for summary judgment dismissing the claim.

The motion is granted.  On the record before the Court,
no reasonable jury could find that Baker made an express warranty
that would give rise to a breach of warranty claim for damages.

Acknowledging that there is not a single, signed
agreement governing the rights of the parties, defendants rely on
two e-mails as the bases for the breach of warranty claim.

First, they cite an e-mail from Baker to Lappin dated May 7, 2001, in which Baker writes:

> While busy . . . , I may have the time to write at least [] one or two of the segments you need.  My fee for research, writing and a re-write, wouldn't exceed $2,500 per fifteen minute script.  A writer who wanted much more than that, might be asking too much.
>
> I might add that it's very important to have the four scripts <u>completely finished to your satisfaction</u>, and in hand, before contracting for production work.

(Schacter 7/11/05 Decl. Ex. F) (emphasis added).  Taking the underscored language out-of-context, defendants argue that "Baker expressly warranted that GJA would be 'completely finished to [the Foundation's] satisfaction.'"  (Def. Opp. Mem. at 20 (quoting Schacter 7/11/05 Decl. Ex. F)).  Of course, Baker was not warranting that he would finish <u>GJA</u> completely to the Foundation's satisfaction, and he was not even undertaking to do all four scripts; he was merely saying that the Foundation should have all four scripts in hand and completed to its satisfaction before it contracted for production work.  No reasonable jury could conclude that this was an express warranty as alleged in the first counterclaim.

Second, the Foundation relies on an e-mail dated October 3, 2001, in which Baker was apparently responding to complaints that Lappin had made about the expenses.  After explaining certain expenses, Baker wrote:

> if i gave the impression that i expect you to pay for material that doesn't meet your approval, i apologize . . . the point is, i HAD NO CHOICE but to invest another $2,000 so

> that i could even show you what i saw in my
> mind . . . at no time have i ever expected
> you, or any other client i've ever worked
> for, to pay for material that isn't perfectly
> acceptable.

(Schacter 7/11/05 Decl. Ex. G).  Defendants argue that this e-mail constitutes an express warranty by Baker that "the Foundation would not have to 'pay for material that isn't perfectly acceptable.'"  (Def. Opp. Mem. at 20-21 (quoting Schacter 7/11/05 Decl. Ex. G)).  Again, this is simply not so. In explaining an expense, Baker was merely saying that he had never expected the Foundation or any other client to pay for material that was not perfectly acceptable.  This expectation was not an express warranty as alleged in the first counterclaim, the breach of which could provide a basis for an award of damages.

Defendants are free to rely at trial on the alleged deficiencies in Baker's work to seek to defeat his claims for damages or to reduce the amount of any award.  They may not, however, pursue the breach of warranty counterclaim to seek recovery of their own purported damages.

## CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment are granted in part and denied in part.  The first, seventh, and eighth claims for relief in the complaint are dismissed, with prejudice, as to both defendants.  The second, third, fourth, fifth, and sixth claims for relief are dismissed as to Lappin individually.  The first counterclaim is dismissed, with prejudice.  The fourth counterclaim is dismissed as moot,

without prejudice to re-filing in the event the Court's dismissal of Baker's copyright claim is reversed on appeal.

Counsel for the parties shall appear for a status conference on March 3, 2006, at 10:30 a.m.

SO ORDERED.

Dated:    New York, New York
          February 22, 2006

DENNY CHIN
United States District Judge